## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **DON FRANK, ET AL** | **CASE NO.  18-cv-978** |
| **-vs-** | **JUDGE DRELL** |
| **KENNETH PARNELL ET AL** | **MAGISTRATE JUDGE PEREZ-MONTES** |

### RULING

Plaintiffs Don Frank and Antonio Frank, Sr. ("Plaintiffs") bring this action pursuant to 42 U.S.C. §1983 and Louisiana tort law on behalf of the estate of their brother, Armando Frank ("Frank"), to recover damages for the alleged excessive use of force by officers of the Marksville Police and Avoyelles Parish Sheriff's Departments.  Pending before the court are three motions for summary judgment: one filed by the City of Marksville ("City") and Officer Kenneth Parnell ("Parnell") (Doc. 55),  one by Former Sheriff Doug Anderson ("Anderson"), Deputy Brandon Spillman ("Spillman"), and Deputy Alexander Daniel ("Daniel")[1] (Doc. 61), and one filed by all defendants (Doc. 62).   Plaintiffs filed their opposition to all three motions (Doc. 71).

I.      Factual Background

The matter before us is a civil rights case arising out of an incident on October 20, 2017, which began as a routine execution of a felony arrest warrant and ended in the tragic death of Armando Frank.  Three officers were involved in the execution of the warrant, Parnell, a lieutenant

---

[1] Deputy Alexander Daniel is erroneously named as "Deputy Alexander" in the original complaint and "Deputy Alexander Daniels" in the amended complaint.

with the Marksville Police Department, Daniel, a deputy with the Avoyelles Parish Sheriff's Department, and Spillman, a deputy for the Avoyelles Parish Sheriff's Department.[2]

According to Plaintiffs, Frank drove his tractor to the Walmart in Marksville, Louisiana on October 20, 2017, to run some personal errands.  Also at Walmart, working on an unrelated law enforcement matter, was Spillman.  According to Spillman, he was driving through the Walmart parking lot in a marked vehicle when he was flagged down by someone who advised him that Frank was sitting on a tractor on the south side of the building.  Spillman was also told of the existence of an active warrant for Frank's arrest.  Spillman contacted the Sheriff's Department and advised the on-duty supervisor, Lt. Monagel, of the same.  Lt. Monagel then dispatched Sergeant Daniel to Walmart.

On duty at that same time was Lt. Parnell.  According to Parnell, Marksville Police Department Captain Couvillion called and advised that another officer called to report a suspect with an active warrant at Walmart.  Parnell drove to Walmart but did not see the suspect initially.  Parnell was advised in a second call that the suspect was located on the side of the building.  Parnell confirmed with dispatch that there was an active felony warrant for Frank's arrest.

According to Daniel, he received a call at 11:05 a.m. notifying him of the existence of the active felony warrant for Frank's arrest and that Frank could be found in the Walmart parking lot.  Daniel called the 911 Communications Center and confirmed the warrant for Frank's arrest.  He drove to Walmart and activated his body camera as he entered the parking lot.

The following facts are established by Daniel's body camera footage and the video from a bystander's cell phone. (Docs 71-4 and 71-11).

___

[2] At the time of the incident, Spillman was enrolled in and attending a POST refresher course at the Alexandria Police Academy as his POST certification had lapsed.  Neither Spillman nor Sheriff Anderson were aware that Spillman failed to meet his POST training requirements in 2016, the year he resigned as Chief of Police from the Simmesport Police Department following the death of his fiancée.

2

Daniel entered the Walmart parking lot and drove to the left side of the building to meet Mr. Frank who was sitting on a red tractor. Daniel stopped his vehicle immediately in front of and perpendicular to Frank's tractor.

As Daniel exited his vehicle, he asked Mr. Frank, who was seated in the tractor seat with his left foot propped up on the steering wheel, whether he was Mr. Frank. Frank responded in the affirmative. Daniel identified himself as Sergeant Daniel with the Avoyelles Parish Sheriff's Department and approached the left side[3] of the tractor.

Frank immediately sat up and leaned somewhat forward to speak to Daniel. Daniel requested identification from Frank. Frank complied with the request and produced his wallet. He then returned to looking at his cell phone. Daniel confirmed Frank's identity, returned the wallet, and began making conversation about the fact Daniel, Frank, and Parnell, who had approached the right side of the tractor, were all veterans.

Daniel asked Frank to come down from the tractor to speak to them. Frank declined and asked what they needed. Daniel said he needs to speak to him away from the tractor. Frank again asked Daniel what he needed. Daniel tells Frank he needed him to get off of the tractor. Frank did not move so Daniel told Frank, "You're coming off the tractor." Again, Frank did not move so Parnell told Frank to come off of the tractor. Frank ignored their orders.

Daniel explained to Frank that he had a warrant for Frank's arrest. Frank asked, "for what?" He put his right foot on the tractor steering wheel and leaned back in his seat. As Daniel explained that he did not know why the warrant was issued, Frank placed his left foot over his right and made it known he was not coming down from the tractor.

---

[3] All references to a side of the tractor are from the perspective of one seated on the tractor.

Again Frank asked what crime was listed in the warrant and again Daniel explained that he didn't know but that they could discuss it when he and Frank arrived at the Sheriff's office.  Frank indicated that Daniel should go get the warrant.  Daniel stated that he would go to the office but that Frank was coming with him.  Frank responded, "I am not leaving this tractor."  Daniel ordered Frank to "get off the tractor, sir."  At this point Frank sat up, put his feet on the floorboard of the tractor, and leaned toward Daniel to ask who signed the warrant.  Daniel responded that he did not know.  Frank's voice became angry as he demanded to know more about the warrant and to see it. He then loudly demanded "show me one."  Daniel repeatedly stated to Frank that he could see it when they arrived at the Sheriff's office.

Frank angrily claimed: "No, you can't arrest me."  Daniel responded: "Yes sir, I can." Frank again demanded that Daniel show him a warrant and Daniel again ordered Frank to get off of the tractor.  At that point, Frank turned to Parnell and told him "Show me the warrant."  Parnell ordered Frank off of the tractor and put his hands on Frank in attempt to pull him off of the tractor. Frank pulled away and Parnell reached for his taser.  Parnell ordered Frank to get off of the tractor or he would tase him.  Frank reached toward Parnell's taser.  Parnell grabbed Frank's right wrist with his left hand and Frank jerked his right arm away as Parnell again ordered Frank off of the tractor.  Parnell ordered Frank to "step off of the tractor."  Frank responded, "show me a warrant." Parnell sternly ordered Frank off of the tractor again and Frank again demanded to see the warrant. Parnell re-holstered his taser and asked if the warrant was confirmed.  Daniel advised it was.

Parnell placed his hands on Frank in an attempt to bring him off of the tractor.  Daniel continued to tell Frank to get off of the tractor.  Frank abruptly stood up and grabbed hold of the tractor steering wheel as Parnell moved away.  Parnell asked Frank why he hit him.  Frank sat back

down, ignored yet another order by Daniel to get off of the tractor, and told Parnell there is no warrant.

Spillman appeared on the body camera footage as he had positioned himself on the right rear wheel well of the tractor. At the same time, a bystander began recording a video on her cellphone. As can be seen on the body camera, Spillman grabbed Frank while demanding he get off of the tractor. Parnell deployed his taser.

On the bystander video, Spillman made the demand for Frank to get off the tractor as Parnell aimed his taser at Frank. Though not visible on the cell phone video, the body camera footage showed Frank swat at Spillman. Parnell deployed his taser and the click of the taser could be heard. Spillman tried to pull Frank off of the tractor and more demands to get off of the tractor are heard. Spillman attempted to position himself behind Frank to place him in a choke hold. Frank pushed back in his seat in an attempted to push Spillman off of him. Frank locked his legs, Spillman loosened his grip on Frank and lost his footing. Daniel pointed his taser at Frank. Frank twisted his body to face right and knock Spillman off of the tractor. Frank was tased. He made no audible signs of distress, but his legs relaxed and he sat back down. Spillman could then push Frank to the left and hold him around the upper chest and neck. The taser was deployed again but Frank moved forward in the seat and grabbed the steering wheel. A taser fired again but it was Spillman who received the shock. He reacted verbally and physically and let go of Frank. Frank continued to hold onto the steering wheel, seemingly unphased.

Once Spillman recovered from the shock, he again attempted to remove Frank from the tractor by wrapping his arm around Frank's chest and pushing Frank to the left. Parnell moved to the left side of the tractor and the three officers attempted to remove Frank. Spillman pushed Frank left and Parnell pulled Frank's left arm backward. They eventually pushed Frank face down

toward his left leg. The noise of a taser could be heard as well as demands to get off of the tractor. Frank continued to fight back. The bystander video ended but the body camera continued to roll.

The officers continued to struggle with Frank and told him to get off of the tractor. Frank was breathing hard and grunting.

Daniel called for an ambulance dispatch because tasers were deployed. Frank continued to try to hold onto the tractor's steering wheel but eventually Spillman and Parnell were able to push Frank's torso toward his left leg. Frank and Daniel both catch their breaths.

Although Spillman pinned Frank to his left side, Frank still attempted to hold himself to the tractor by his feet. Daniel moved Frank's left foot but his right leg was wedged under the tractor pedal. Daniel ordered Frank to move his foot so they could get him off of the tractor. Frank refused.

As the officers awaited backup from other Sheriff's deputies, Frank denied again that there was a warrant for his arrest. Frank demanded that he be let up. Daniel responded to Frank that he needed to move his right leg in order to come off of the tractor. Frank continued to demand that he be let up while new officers on the scene helped Daniel, Parnell, and Spillman remove Frank from the tractor. The various officers moved Frank to the ground and struggled to place Frank in handcuffs. Frank and Daniel were both breathing heavily during this time.

Once cuffed, various unknown officers attempted to pick Frank up and walk him to the car. Parnell commented that Frank was "dead weighting." Frank was dragged to Daniel's vehicle and placed in the back. The unknown officers who placed Frank in the car said either to "sit him up" or "get him up." Moments later, one of the unknown officers asked if Frank was breathing. Officers discuss whether an ambulance was called and its location. Approximately three minutes later, Acadian Ambulance arrived. Paramedics encountered Frank in the police vehicle. They

move Frank from the vehicle and note that he had a faint pulse and shallow breathing. Acadian Ambulance puts Frank on a stretcher in the ambulance where he coded. Despite paramedics performing chest compressions and other life-saving measures, Frank did not recover and was pronounced dead at the hospital.

Dr. Christopher Tape, M.D., a forensic pathology, performed an autopsy and determined the cause of death to be a homicide. The cause was "asphyxia due to respiratory compromise due to law enforcement arrest with contribution of hypertensive atherosclerotic cardiovascular disease, obesity, and electronic control device shocks."

II.    Procedural Background

Plaintiffs filed the instant lawsuit against Parnell, Daniel, Spillman, the City of Marksville, and Doug Anderson in his official capacity as the Sheriff of Avoyelles Parish[4] ("Sheriff") asserting various claims including those for excessive force in violation of the Fourth and Fourteenth Amendments, assault and battery, conspiracy, *respondeat superior*, wrongful death, lost chance of survival, and punitive damages. (Doc.1). In response, the City and Parnell filed a motion to dismiss (Doc. 7) and Anderson, Daniel, and Spillman filed an answer (Doc. 9).

Plaintiffs filed an opposition to the motion to dismiss (Doc. 12) in which they offered to amend their complaint by dropping the federal *respondeat superior* claims against the City and Anderson as well as official capacity claims against Parnell, Spillman, and Daniel. Magistrate Judge Perez-Montes issued a report and recommendation (Doc. 14) recommending the motion be granted in part and denied in part. The undersigned adopted the Magistrate Judge's findings and issued a judgment dismissing the claims which the Plaintiffs sought to voluntarily dismiss. (Doc. 15).

---

[4] Doug Anderson, the former Sheriff of Avoyelles Parish, is now deceased. The current sheriff is Sheriff is David L. Dauzat. Accordingly, Doug Anderson will be referred to by "Sheriff."

Thereafter, the Plaintiffs filed a "First Supplemental and Amended Complaint" naming the City, Parnell, Anderson, Spillman, and Daniel. (Doc. 19). The defendants responded to the amended complaint by filing answers asserting affirmative defenses including qualified immunity. (Docs. 20 and 21). Defendants later filed the 3 present motions for summary judgment: one by the City and Parnell (Doc. 55), one by the Sheriff, Spillman, and Daniel (Doc. 61), and one by the Sheriff, Spillman, Daniel, the City and Parnell (Doc. 62).

The motion filed by the City and Parnell claims that Parnell is entitled to qualified immunity and seeks dismissal of the excessive force claims, which were brought against him in his individual capacity. Additionally, the City and Parnell seek dismissal of the claims for failure to render care, conspiracy, punitive damages, battery, execution of the warrant, loss of chance of survival and *respondeat superior*. (Doc. 55). Defendants Spillman and Daniel also assert the defense of qualified immunity and seek dismissal of claims for excessive force brought against them in their individual capacities. They and Sheriff Anderson also seek dismissal of the claims for *respondeat superior*, punitive damages, execution of the arrest warrant, assault and battery, loss of a chance of survival, conspiracy, and delayed medical care. (Doc. 61). Finally, all defendants assert the excessive force claims and the state law negligence claims, including wrongful death, should be dismissed as the Plaintiffs cannot establish causation. (Doc. 62).

All three motions are ripe and before the court for disposition.

III.    Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir.1983). However, the non-moving party does not establish a genuine dispute with "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'by unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, and (2) the movant is entitled to judgment as a matter of law.

IV.     Analysis

A.  Individual Capacity; Qualified Immunity

The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal. Anderson v Creighton, 483 U.S. 635, 638 (1987) (Qualified immunity shields government officials performing discretionary functions from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."). Qualified immunity is "an immunity from suit rather than a mere defense to liability, ...it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v Forsyth, 472 U.S. 511, 526 (1985); White v. Pauly, 580 U.S. 73 (2017). The issue of whether qualified immunity applies should be resolved at the earliest possible stage in the litigation. Porter v. Epps, 659 F.3d 440, 445 (5th Cir.2011).

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 577, 589 (2018). "[T]he plaintiff has the burden to negate the defense once properly raised." Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir.2012) (quoting Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir.2008)). "A public official is entitled to qualified immunity unless the plaintiff demonstrates: (1) that the defendant violated the

plaintiff's constitutional right and (2) the defendant's actions were objectively reasonable in light

of clearly established law at the time of the violation." Porter, 659 F.3d at 445 (citing Freeman v.

Gore, 483 F.3d 404, 410-11 (5th Cir.2007).  A court may begin its analysis of qualified immunity

with either prong.  Gibson v. Kilpatrick, 773 F.3d 661, 666 (5th Cir.2014).

> A good-faith assertion of qualified immunity alters the usual summary judgment
> burden of proof,' shifting it to show that the defense is not available.  The plaintiff
> must rebut the defense by establishing that the official's allegedly wrongful conduct
> violated clearly established law and that genuine issues of material fact exist
> regarding the reasonableness of the official's conduct.  To negate a defense of
> qualified immunity and avoid summary judgment, the plaintiff need not present
> "absolute proof" but must offer more than "mere negligence."

King v. Handorf, 821 F.3d 650, 653-54 (5th Cir.2016) (internal citations and quotation marks

omitted).

Qualified immunity "protect[s] officers from the sometimes hazy border between excessive

and acceptable force."  Saucier v. Katz, 533 U.S. 194, 206 (2001) (citations and quotations

omitted), overruled in part on other grounds, Pearson v. Callahan, 555 U.S. 223, 227 (2009).  In

determining whether the use of force was clearly excessive and clearly unreasonable, we evaluate

each officer's actions separately, to the extent possible.  See Meadours v. Ermel, 483 F.3d 417,

421-22 (5th Cir.2007) (holding that each officer's individual actions should be considered in

determining whether qualified immunity applies).

i.     Excessive force

Plaintiffs allege that Parnell, Daniel, and Spillman intentionally and/or willfully acted to

cause serious bodily injury to Frank by tasing him repeatedly; hitting him with a baton; placing

him in a choke hold; and, compressing his body.  Plaintiffs claim these actions, in combination,

constituted excessive force that caused Frank's death.   As Plaintiffs address Parnell, Spillman,

and Daniel's conduct together, so shall we.

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir.2009)(quoting Graham v. Connor, 490 U.S. 386, 396 (1989). "[T]he result depends very much on the facts of each case." Brosseau v. Haugen, 543 U.S. 194, 201 (2004). The use of force must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Poole, F.3d at 627 (quoting Graham, 490 U.S. at 397). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

The inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Graham v. Connor, 490 U.S. 386, 398 (1989). To determine whether the force used was "objectively reasonable," one may consider: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether he was actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (1989).

The first factor, severity of the crime at issue weighs in favor of the officers as they were attempting to execute a felony arrest warrant. Plaintiffs argue that this factor weighs in their favor as the warrant was not for a violent felony offense. They suggest the officers didn't believe that the warrant was for a violent offense as they admit they didn't know the basis for the warrant. We disagree. Unlike most of the cases cited by Plaintiffs, this was not a misdemeanor traffic offense.

11

The officers knew there was a felony warrant outstanding and that based upon that warrant, they had probable cause to arrest Frank.

The second factor weighs in favor of Frank as the tractor, which could have been viewed by a reasonable officer on the scene as a threat to safety, was not turned on; was blocked by at least one patrol car; and had a farming implement attached to the rear.  Accordingly, we do not find that the tractor posed an "immediate threat" to anyone's safety.

It is the third factor, whether Frank was actively resisting arrest or attempting to evade arrest by flight, that is essential to determining whether excessive force was used against Frank.  Plaintiffs argue that Frank was passively resisting; thus, there was no reason to use force against him.  In support, they cite the case of Trammel v. Fruge, 868 F.3d 332, 343 (5th Cir.2017) wherein the Fifth Circuit denied qualified immunity to an officer that tackled a suspect after the suspect jerked his arm away.  Plaintiffs argue that like Trammel, Frank did not show aggression beyond jerking his hand away from officers and he was not a flight risk.  Plaintiffs further argue that even when officers pulled on Frank and tased him, he never fought back.  Plaintiffs also cite Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir.2009) in which the Fifth Circuit denied qualified immunity where two officers dragged a women out of her car after she refused to step out of her vehicle for a traffic stop until her husband could arrive to take custody of her two year old grandchild.

Having reviewed the record thoroughly, we cannot say that Frank was passively resisting arrest.  To clarify the difference between use of force in cases of passive resistance and active resistance we look at Betts v. Brennan, 22 F.4th 577 (5th Cir.2022) in which the Fifth Circuit stated:

> True, we "have paid particular attention to whether officers faced active resistance when they resorted to a taser."  Cloud, 993 F.3d at 384.  But the line between passive and active resistance is somewhat hazy and must be judged in light of the "necessarily fact-intensive" nature of the inquiry."  Deville, 567 F.3d at 167.  For instance, we have found tasing excessive when an arrestee "did no more than pull his arm out of the officer's grasp," Cloud v. Stone, 933 F.3d 379, 385 (5th Cir.2021)

(citing <u>Ramirez v. Martinez</u>, 716 F.3d 369, 372, 378 (5th Cir.2013); <u>Trammell v. Fruge</u>, 868 F.3d 332, 341-42 (5th Cir.2017)).  We have also said "officers could not tase someone who had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an 'off-color joke.'" <u>Ibid.</u> (citing <u>Newman v. Guedry</u>, 703 F.3d 757, 762-63 (5th Cir.2012)).  On the other hand, we have found tasing not excessive where a suspect "resists arrest or fails to follow police orders" or "resist[s]" an officer's attempt to handcuff him.  <u>Ibid.</u> (citing <u>Buchanan v. Gulfport Police Dep't.</u>, 530 F.Appx 307, 314 (5th Cir.2013) (per curiam); <u>Collier v. Montgomery</u>, 569 F.3d 214, 219 (5th Cir.2009)).  And we have relied on other circuit's decisions finding tasing justified when an arrestee "'used profanity, moved around and paced in agitation, and repeatedly yelled at [an officer]' while refusing a series of verbal commands."  <u>Id.</u> at 385 n.6 (Alteration in original (quoting <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1278 (11th Cir.2004)).

<u>Id.</u> at 583.

Although Frank's initial demeanor was calm, he became increasingly obstinate when officers did not do as he requested to present him with a warrant.  Plaintiffs argue that Frank was within his rights to refuse to comply with the officer's orders as Article 218.1 of the Louisiana Code of Criminal Procedure provides:

> When a person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self-incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel.

Plaintiffs misread Article 218.1 as it speaks to what shall be explained to someone once they have been arrested or detained.  Neither an arrest nor a detention took place during the time that Frank demanded to see the warrant.  Even if Frank had been entitled to the information, he failed to conform to the conduct required by Louisiana law: "A person shall submit peaceably to a lawful arrest.  The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained."  La.C.Cr.P. art. 220.  Further, as the Fifth Circuit noted in a footnote when addressing a dissenting opinion in <u>Poole v. City of Shreveport</u>, 691, F3d 624, 632, ft 6 (2012): "The application of force to effect an arrest is not a parlor game in which the arresting officers must

consider the arrestee's sensibilities.   Arrests are inherently dangerous and can escalate precipitously if the arrestee is not overcome immediately."

As Frank's tone became aggressive, so did his physical demeanor. Frank removed his feet from the steering wheel, placed them on the floorboard, and bent over at the waist challenging Daniel's order to come down from the tractor and submit to his arrest.   Frank continued to challenge the officers' authority and vehemently maintained he was not coming down from the tractor.   As it was obvious to officers that Frank was not going to cooperate or submit to their commands, Parnell pulled his taser as a show of force.   Frank reached for the taser.   Parnell grabbed his wrist, and Frank pulled his arm away.   Parnell holstered the taser and attempted to pull Frank off of the tractor.   It is at that point that Parnell can be heard on the video asking Frank why he hit him.

Despite continued orders to pull Frank off of the tractor, he grabbed the steering wheel so he could not be pulled off.   When Spillman attempted to subdue Frank with a choke hold, Frank pushed back against Spillman.   He wedged his feet under the pedals even after the officers managed to subdue him.   Frank's conduct was not merely passive.   His resistance escalated and as it did, so did the officers' response.

Plaintiffs cite the bystander's account that she never saw Frank fight back, but the body camera footage contradicts her statement.   Further, she confirmed that Frank braced himself on the tractor by grabbing the steering wheel.   Based on all of Frank's conduct leading to that point, the officers properly viewed his efforts to remain on the tractor as active resistance.

Plaintiffs argue that the quickness with which Parnell and Daniel resorted to using their tasers shows the officers did not act reasonably.   We understand Plaintiffs' timeline and agree that the entire incident occurred in a very short period.   However, the situation rapidly evolved.   Frank

was unyielding as soon as the officers asked him to come down from the tractor and increasingly so once he was told there was a warrant for his arrest. Frank was unwilling to negotiate with Daniel who repeatedly made verbal commands to Frank. Although Parnell drew his taser as a show of force, it was not used. He holstered the taser and attempted to pull Frank down. It was only after Frank had tried to grab the taser, hit Parnell and failed to comply with repeated commands that Parnell again drew and fired his taser. It wasn't until Frank was seemingly unphased by Parnell's taser that Spillman initiated a choke hold. All this time, additional commands to come off of the tractor were made. To those demands, Frank verbally and/or physically resisted.

The three officers were working together to try to wrestle a man off of an elevated tractor seat. The shocks from the taser had no obvious effects on Frank. With each tase, Frank physically resisted more. The chokehold had no obvious effect either as Frank was able to push back against Spillman and continue fighting the three officers to maintain his position on the tractor. Even when the officers had somewhat subdued Frank and had him bent over to his left side, he continued to resist by pinning his foot under the pedal. Parnell testified that he used a baton on Frank's peroneal nerve to try to move Frank's foot from its location under the pedal but again, the force seemed to have no effect on Frank. It took the three officers on the scene as well as several responding officers to move Frank from the tractor to the ground, and handcuff him. Because of Frank's intense physical resistance Parnell believed that Frank was "dead weighting" when the several officers attempted to pick him up. At no time did Frank's resistance end; thus, neither did the officers' use of force.

In October 2017, the Fifth Circuit and "[s]everal other circuits ha[d] determined similarly that, where a suspect resist[ed] arrest or fail[ed] to follow police orders, officers d[id] not violate

his right against excessive force by deploying their tasers to subdue him." Buchanan v. Gulfport Police Dept., 530 Fed.Appx. 307, 314 (5th Cir.2013) (citing Meyers v. Baltimore Cnty. Md., 713 F.3d 723, 732-34 (4th Cir.2013); Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir.2012); McKenney v. Harrison, 635 F.3d 354, 357-58 (8th Cir.2011). It was also clearly established at the time of the officers' encounter with Frank that "an officer's application of a Taser to an unarmed, seated suspect who fail[ed] to comply with an order to get on the ground [was not] 'objectively *un*reasonable in light of clearly established law.'" Carrol v. Ellington, 800 F.3d 154,174 (5th Cir.2015) (citation omitted and emphasis supplied).

Additionally, it was clearly established at the time of this incident that "[o]fficers are trained to use nonlethal force to gain compliance if a subject actively resists arrest and does not comply with verbal task directions to get on the ground." Id. (citations omitted). "Officers [could] consider a suspect's refusal to comply with instructions…in assessing whether physical force [was] needed to effectuate the suspect's compliance." Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir.2009) (per curiam). And, choke holds are not objectively unreasonable conduct where the suspect physically resists arrest. Wagner v. Bay City, Tex., 227 F.3d 316, 324 (5th Cir.2000) (citing Gassner v. City of Garland, 864 F.2d 394, 400 (5th Cir.1989).

Based on the foregoing law and the application of these facts thereto, we conclude that the use of force, tasers and a choke hold, was not unreasonable under the circumstances as Frank continued to refuse to comply with repeated verbal commands, actively refused to step off of the tractor, and actively resisted the officers' physical attempts to overcome and detain him. The officer's actions, although quick, were measured and ascending responses to Frank's noncompliance.

ii.   Denial of Medical Care

"The Due Process Clause…require[s] the responsible government or governmental agency to provide medical care to persons…who have been injured while being apprehended by the police. City of Revere v. Mass.Gen.Hosp, 463 U.S. 239, 244 (1983). "[T]he plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference." Hill v. Carrol County, 587 F.3d 230, 238 (5th Cir.2009).

Deliberate indifference is an extremely high standard to meet in that a plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard of any serious medical needs." Domino v. Tex. Dep't of Crim. J., 239 F.3d 752, 756 (5th Cir.2001) (quoting Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir.1985)).

Here there is no evidence of deliberate indifference. Daniel called for the ambulance when the parties were still struggling because a taser was used. Although none of the three officers remained with Frank once he was cuffed, they did not leave him alone. Frank was in the custody of fellow officers. Those officers questioned whether Frank was breathing and then made inquiries as to whether an ambulance was called or on its way. The ambulance arrived shortly thereafter. Accordingly, there was no refusal to treat or delay medical care to Frank.

As such, claims for denial of medical care against Parnell, Daniel, and Spillman will be dismissed with prejudice.

B.  Monell Claims

i.   Sheriff Anderson

The Sheriff asserts that no claims were filed against him in his official capacity. Plaintiffs do not assert otherwise in their opposition and we do not find any such assertions in the complaint

17

or amended complaint.  As there are no official capacity claims pertaining to Sheriff Anderson, we will not address the matter.

ii.      City of Marksville

We also note that to hold the City of Marksville liable for constitutional violations, the Plaintiffs would have to allege and prove the existence of: (1) a policymaker; (2) and official policy; and (3) a violation of a constitutional right whose "moving force" is the policy to impose liability on the City of Marksville.  Id. at 694.  No such allegations were asserted and no evidence of the same exists in the record.  Accordingly, we will not address this issue.

iii.      Punitive Damages

Punitive damages are recoverable against government employees sued in their individual capacities pursuant to §1983.  Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Smith v. Wade, 461 U.S. 30, 35 (1983) and Williams v. Kaufman County, 352 F.3d 994, 1015 (5th Cir.2003)).  "But punitive damages may be awarded only when the defendant's conduct "is 'motivated by evil intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights."  Williams, 352 F.3d at 1015 (quoting Sockwell v. Phelps, 20 F.3d 187, 192 (5th Cir.1992) (citing Smith v. Wade, 461 U.S. at 56)).

Again, the officers commanded Frank come down from the tractor and submit to his arrest numerous times.  Frank chose not to comply.  They responded in measured and ascending force as they were trained.  Plaintiffs have failed to point to any evidence establishing that either Parnell, Spillman or Daniel acted with any ill will, recklessness, or callous indifference to Frank's constitutional rights.  Accordingly, Plaintiffs are not entitled to punitive damages.

18

iv.   The Warrant Request

Frank's initial resistance to arrest was reflected in his demands to see the arrest warrant that the officers said existed.  There is no dispute among the parties that a felony warrant for the arrest of Armando Frank was active at the time of the incident.  The fact the officers did not know the basis for the warrant or who signed it, the warrant was still active and the officers were there to execute it.

Louisiana Code of Criminal Procedure article 217 provides:

A peace officer, when making an arrest by virtue of a warrant, shall inform the person to be arrested of his authority and of the fact that a warrant has been issued for his arrest, unless he flees or forcibly resists before the officer has an opportunity to inform him, or unless the giving of such information would imperil the arrest. The officer need not have the warrant in his possession at the time of the arrest, but after the arrest, if the person arrested so requests, the warrant shall be shown to him as soon as practicable.

Based on Louisiana law, the officers' refusal to provide a copy of the warrant until Frank was arrested and arrived at the Sheriff's Department was not improper.  It was of no consequence that the officers did not have a copy of the warrant with them.  Even if the officers' thought Frank's request to see the warrant was reasonable, they were under no obligation to oblige.  The duty here belonged to Frank to peaceably submit to the lawful arrest.

v.   Execution of the Warrant

Plaintiffs assert that when the officers should have waited for another time to arrest Frank as there were no exigent circumstances.  We do not find a legal cause of action, such as false arrest, within this allegation.  Moreover, Plaintiffs have not provided any law to support their position.

Defendants note and we agree that "[o]nce a warrant is issued, or probable cause comes into existence, it becomes an officer's duty to arrest the suspect regardless of his personal feelings, good or ill, towards the suspect." Smith v. Gonzales, 670 F.2d 522 (5th Cir.1982), *cert. denied* 459

19

U.S. 1005 (1982) (citing <u>Perry v. Jones</u>, 506 F.2d 778, 780 (5th Cir.1975);  See also  <u>Maier v. Green</u>, 485 F.Supp.2d 711, 720 (W.D. La.2007); <u>Thomas v. Frederick</u>, 766 F.Supp. 540, 557 (5th Cir.1991).  Louisiana courts, in analyzing the validity of arrests, have determined that "once the officers kn[ows] of the outstanding arrest warrants, they would have been derelict in their duty not to arrest the defendant." <u>State v. Holl</u>, 725 So.2d 1282, 1287 (La. 1998) (considering "whether, after determining that the initial <u>Terry</u> stop of the defendant was unlawful, the lower courts properly suppressed evidence subsequently seized from the defendant in a search incident to his arrest on outstanding warrants.").  Accordingly, we do not find merit to Plaintiff's argument.

### C.  State Law Claims

#### i.    Use of force

An officer "may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." C.Cr.P. art 220.  "Louisiana's excessive force tort mirrors its federal constitutional counterpart. 'The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result." <u>Deville</u>, 567 F.3d at 172 (quoting <u>Kyle v. City of New Orleans</u>, 353 So.2d 969, 972 (La.1977).  Accordingly, we rely upon our consideration of the <u>Graham</u> factors and our determination that excessive force was not used against Frank.  For this reason, summary judgment will be granted as to Plaintiffs' state law claims for use of excessive force.

#### ii.    Punitive damages

"It is well-settled in Louisiana that punitive damages are available only where authorized by statute." <u>Warren v. Shelter Mutual Insurance Co.</u>, 233 So.3d 568, 586 (La. 2017) (citing <u>Mosing v. Domas</u>, 830 So.2d 967, 973 (La. 2002); <u>Ross v. Conoco, Inc.</u>, 828 So.2d 546, 555 (La.

2002)).  Plaintiffs have not pointed to any statute which would entitle them to punitive damages in this case.  Accordingly, their claim to recover punitive damages will be dismissed.

### iii.    Assault and battery

If an officer uses unreasonable or excessive force, he and his employer could be liable for damages.  Kyle v. City of New Orleans, 33 So.2d 969, 972 (La. 1977).  (Citations omitted).    As we have determined there are no genuine issues as to whether any of the officers used unreasonable or excessive force, there is no claim for assault and battery.

### iv.    Loss of a chance of survival

"[T]he claim of loss of chance of survival is limited to medical malpractice claims... ." Moore v. LaSalle Corrections, Inc., 2020 WL 6389182 (W.D. La. 2020) (citing Smith v. State of La., Dept. of Health and Hosp., 676 So.2d 543 (La. 1996) (a decision which addressed damages in a medical malpractice case).  It is not recognized in general negligence matters in Louisiana. Niang, (La.App. 4 Cir.2019).  Accordingly, this claim will be dismissed.

### v.    Conspiracy and Solidary Liability

Plaintiffs argue the three officers, Parnell, Spillman, and Daniel are intentional tortfeasors who acted in a conspiracy to cause serious bodily harm and are, thus, solidarily liable for Frank's death pursuant to C.C. art 2324(A).  There is simply no evidence in the record which establishes these officers acted in a conspiracy to inflict serious bodily harm or death upon Frank.  Frank's death was extremely tragic as no one believes an arrest should end in death, but there is simply no evidence before the court that either Parnell, Spillman, or Daniel acted intentionally.

### vi.    Medical Care

"A police officer owes a duty to a person while in his custody to protect him from injury and to care for his safety." Evans v. Hawley, 559 So.2d 500, 504 (La.App. 2 Cir.1990), writ denied,

563 So.2d 1156 (La.1990) (citing <u>Griffis v. Travelers Insurance Co.</u>, 273 So,2d 523 (La.1973).

"However, this means that the officer must do only what is reasonable under the circumstances,

and he is only liable for a certain category of risks to which his prisoner may be subjected." <u>Griffis</u>,

273 So.2d at 526.  This duty is akin to the duty as is required under federal law, so for the reasons

set forth above, we find that Parnell, Spillman, and Daniel did not fail to render proper medical

care.

vii.    <i>Respondeat Superior</i>

Article 2320 of the Louisiana Civil Code states: "Masters and employers are answerable

for the damage occasioned by their servants and overseers, in the exercise of the functions in which

they are employed."  "Under Louisiana law, an employer is liable for the tortious acts of an

employee if the employee's actions were within the course and scope of his employment." <u>Roberts</u>

<u>v. City of Shreveport</u>, 221 Fed.Appx. 314, 315 (W.D. La. 2007) (citing <u>LeBrane v. Lewis</u>, 292

So.2d 216, 217-18 (La.1974).

As we have found that neither Parnell, Spillman nor Daniel used excessive force or

committed an assault or battery, neither the Sheriff nor the City of Marksville can be held liable

for conduct undertaken by the officers in the course and scope of their employment.

V.    Conclusion

For the foregoing reason, Parnell, Spillman, and Daniel's are entitled to qualified

immunity.  The motions for summary judgment filed by Parnell and the City of Marksville will be

granted as will the motion for summary judgment filed by Spillman, Daniel, and Sheriff Anderson.

The Defendants' motion for summary judgment regarding medical causation will be denied as

22

moot.  The court will issue a judgment in conformity with these findings.

THUS DONE AND SIGNED at Alexandria, Louisiana this _13_ day of June 2022.


DEE D. DRELL, SENIOR JUDGE
UNITED STATES DISTRICT COURT