# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 8, 2023

Lyle W. Cayce
Clerk

———————

No. 22-30408

———————

DON FRANK, *Individually & as Representative on behalf of* ARMANDO FRANK ESTATE; ANTONIO FRANK, SR., *Individually & as Representative on behalf of* ARMANDO FRANK ESTATE,

*Plaintiffs—Appellants,*

*versus*

KENNETH PARNELL; DEPUTY ALEXANDER; DEPUTY SPILLMAN; CITY OF MARKSVILLE; DOUG ANDERSON, *in his official capacity, also known as* SHERIFF OF AVOYELLES PARISH,

*Defendants—Appellees.*

————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:18-CV-978

————————————————————

Before WIENER, GRAVES, and DOUGLAS, *Circuit Judges*.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the district court is VACATED as to granting summary judgment to Appellees

on qualified immunity grounds, the dismissal of the parallel Louisiana state tort claims, and the denial of punitive damages as a matter of law. On REMAND, the district court can consider any challenges to medical causation as well as vicarious liability against the City of Marksville and Doug Anderson in accordance with this court's decision.

IT IS FURTHER ORDERED that Appellees pay to Appellants the costs on appeal to be taxed by the Clerk of this Court.



**Certified as a true copy and issued
as the mandate on Oct 10, 2023**

**Attest:** *Lyle W. Cayce*
**Clerk, U.S. Court of Appeals, Fifth Circuit**

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 8, 2023

Lyle W. Cayce
Clerk

---

No. 22-30408

---

DON FRANK, *Individually & as Representative on behalf of* ARMANDO FRANK ESTATE; ANTONIO FRANK, SR., *Individually & as Representative on behalf of* ARMANDO FRANK ESTATE,

*Plaintiffs—Appellants,*

*versus*

KENNETH PARNELL; DEPUTY ALEXANDER; DEPUTY SPILLMAN; CITY OF MARKSVILLE; DOUG ANDERSON, *in his official capacity, also known as Sheriff of Avoyelles Parish*,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:18-CV-978

---

Before WIENER, GRAVES, and DOUGLAS, *Circuit Judges*.

PER CURIAM:[*]

Before the court is an appeal of a grant of summary judgment based on qualified immunity for Appellants' excessive force claim. The district court

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

held that the officers' use of force, including tasers and chokeholds, was not unreasonable under the facts of this case. We VACATE and REMAND.

## Factual Background

Armando Frank, a mentally ill, disabled veteran, was a lifelong resident of Marksville, Louisiana. In this town of approximately 5,000 people, Frank was known as "the man on the tractor" because he drove his red tractor around town. On October 20, 2017, Frank drove his tractor to Walmart for a personal errand. As he sat on the tractor in the parking lot, he was approached by Deputies Brandon Spillman and Alexander Daniel of the Avoyelles Parish Sheriff's Office, where Marksville is located. They parked their vehicles directly in front of Frank's tractor to prevent the tractor from being used as a means of escape or a weapon. Around the same time, Officer Kenneth Parnell of the Marksville Police Department arrived at the scene. Immediately after arriving, Daniel approached Frank, identified himself as an Avoyelles Sherriff's Office Deputy, and asked for identification from Frank. Frank promptly handed Daniel his identification. Spillman and Daniel told Frank that they had an outstanding warrant for his arrest and wanted Frank to come with them.

Frank repeatedly asked to see the arrest warrant, and Daniel informed him that he could see it at the police station. When Frank asked what the charges were, Daniel, Spillman, and Parnell refused to tell him. At this point, the encounter became tense. Frank declared that he was not leaving the tractor, and Parnell quickly resorted to force, reaching in from the right to pull Frank off the tractor. Frank provided some resistance and tried to keep Parnell off the tractor.

Approximately 30 seconds later, Parnell deployed his taser into Frank's chest for a five second cycle. Frank removed one of the taser probes. A few seconds later, Spillman jumped onto the tractor and put Frank into a

chokehold while screaming "get off the goddamned tractor." Then, while Frank was being choked, Daniel deployed his taser and hit Frank in the leg. Shortly after, Parnell performed a drive stun where he physically stunned Frank on his leg with the taser for pain compliance. Spillman continued to choke Frank while Parnell twisted Frank's left arm far behind his back. Daniel performed two drive stuns with his taser. Parnell then performed two more drive stuns with his taser. In total, Frank was tased 7 times in less than a minute. Within only minutes of his encounter with the officers, Frank was rendered unconscious, and, according to the forensic pathologist, was "for all intents and purposes, dead." Frank was pronounced dead less than an hour after the incident began.

## I. Autopsy report

On October 23, 2017, the forensic pathologist, Dr. Christopher Tape, performed an autopsy on Frank. In addition to physically examining the external and internal parts of Frank's body, Dr. Tape's autopsy also included an examination of the body camera video evidence. In analyzing the video evidence, Dr. Tape noted that during the encounter but after the chokehold, Frank started breathing heavily and began "cough[ing] . . . "gasp[ing] . . . [and] speak[ing] in a deep and strained voice." According to Dr. Tape, this happened because of Spillman's "carotid sleeper hold evolving into a bar hold for approximately 15 seconds with another bar hold for approximately 6 seconds[,]" combined with Frank's body being pressed onto the tractor and being pulled from the front, which compressed his chest and abdomen and reduced his ability to ventilate. After the officers removed Frank from the tractor, he was "placed face down with his hands behind his back with multiple law enforcement officers partially on his back and neck and lower extremities." For 27 seconds, the officers stayed on Frank's back while Frank was face down on the ground with his hands behind his back. For the next 41 seconds, the officers tried to lift him with no response, and Parnell declared

that Frank was "dead weighting." While Frank was unconscious, the officers dragged him and put him headfirst into a SUV patrol car. Captain Honea of the Avoyelles Parish Sheriff's Office, who arrived at the scene, noticed Frank's shallow breathing and directed another officer to call paramedics, who arrived three minutes later. Frank coded on the stretcher, and paramedics attempted to begin chest compressions and to intubate Frank, but he never regained a heartbeat. Frank was pronounced dead on October 20, 2017 at 11:50 a.m., less than an hour after the incident began.

Dr. Tape listed Frank's cause of death as "[a]sphyxia due to respiratory compromise due to law enforcement arrest with contribution of hypertensive atherosclerotic cardiovascular disease, obesity (BMI=37), and electronic control device shocks." Dr. Tape detailed a timeline of the asphyxiation: in total 6 minutes and 42 seconds of respiratory compromise, which included 15 seconds of a carotid sleeper hold and bar hold, 6 seconds of bar hold, 165 seconds of compressional asphyxia being pressed against the tractor, 27 seconds of compressional asphyxia being face down on the ground with his hands on his back, 41 seconds of positional asphyxia while loading, as well as 148 seconds of positional asphyxia in the back of the SUV. Frank's physical autopsy also showed injuries "consistent with evidence of a manual strangulation."

According to Dr. Tape, it is likely that Frank "primarily died as a result of respiratory (and possibly some vascular) compromise due to a struggle with police, supported by autopsy and video evidence." Dr. Tape determined that the respiratory compromise consisted of "neck holds (strangulation), the body being pressed, compromising ventilation (compressional asphyxia), the body on the ground with hands behind the back and personnel on him (compressional asphyxia and positional asphyxia), and the body face down with hands behind the back in the back of an SUV (positional asphyxia)." Moreover, the tasers "likely caused respiratory

No. 22-30408

compromise by paralyzing the muscles of ventilation including the chest, abdomen and accessory muscles," and the "addition of the pain of being shocked likely stopped effective breathing, at least temporarily."

According to Dr. Tape, "it seems that the law enforcement arrest was the intervening factor that led to the death," and for "medicolegal purposes such as the death certificate, the manner of death should be classified as a homicide."

## Procedural History

On July 27, 2018, approximately 9-months after the death of Armando Frank, Don Frank and Antonio Frank, individually, as the surviving heirs of their brother, Armando Frank, and as representatives of Armando Frank's estate, filed a civil complaint in the United States District Court for the Western District of Louisiana.[1] The lawsuit named Parnell, Spillman, Daniel, and Doug Anderson as Avoyelles Parish Sheriff, and the City of Marksville as defendants and alleged causes of action under 42 U.S.C. § 1983 and Louisiana state law. On June 10, 2019, the district court granted in part Defendants' motion to dismiss with leave to replead. On June 25, 2019, Frank filed an amended complaint which alleged a Section 1983 excessive force claim and claims for excessive force, assault, and battery under Louisiana law, seeking compensatory and punitive damages.

In early November of 2021, all Appellees moved for summary judgment on the ground of qualified immunity. On June 13, 2022, the district court found that the defendants were entitled to qualified immunity and dismissed the case.

---

[1] For simplicity, the Appellants are referred to as "Frank."

No. 22-30408

## Standard of Review

The standard of review on summary judgment is *de novo*. *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018). The court should grant summary judgment where there is no genuine dispute of material fact "and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). "[W]e view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017) (quoting *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017)). This court "may affirm [summary judgment] on any grounds supported by the record." *McGruder v. Will*, 204 F.3d 220, 222 (5th Cir. 2000).

## Discussion

## I. Qualified Immunity

"Consistent with our standard of review for summary judgments, the legal issues underlying the district court's qualified-immunity ruling is reviewed *de novo*." *Bey v. Prator*, 53 F.4th 854, 857 (5th Cir. 2022). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (internal citations omitted). Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Bey*, 53 F.4th at 857 (internal quotation omitted). A court may rely on either prong of the defense in its analysis. *Brown*, 623 F.3d at 253

No. 22-30408

### 1. Constitutional Violation

When "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Since an excessive force claim arises out of the Fourth Amendment, the test applied is whether the force was reasonable. *Id.* at 396. This reasonableness inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* However, the court "cannot apply this standard mechanically." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Excessive force claims are "necessarily fact-intensive," and whether force is excessive or unreasonable "depends on the facts and circumstances of each particular case." *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018) (internal quotations omitted).

"In making this [objective reasonableness] determination, a court should consider the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* at 728–29 (quoting *Graham*, 490 U.S. at 396). These are known as the *Graham* factors. Additionally, while not "exclusive" and outlined "only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force," the court can also consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

The situation before the court is aided by video evidence from multiple angles of the interaction. "The reasonableness inquiry is inherently factbound, making the video of this . . . event critical." *Harmon v. City of Arlington*, 16 F.4th 1159, 1164 (5th Cir. 2021); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007) (the court of appeals "should have viewed the facts in the light depicted by the videotape"). Therefore, instead of having to take the parties' version of the events as canon, the court "should not . . . rel[y] on such visible fiction," to the extent that there is any. *Scott*, 550 U.S. at 380–81.

### a. *Graham* Factors

### i. Threat-of-harm

While all factors are relevant, the "threat-of-harm factor typically predominates the analysis when deadly force has been deployed," so we will begin there. *Harmon*, 16 F.4th at 1163. The district court held that this factor weighed in favor of Frank "as the tractor, which could have been viewed by a reasonable officer on the scene as a threat to safety, was not turned on; was blocked by at least one patrol car; and had a farming implement attached to the rear." *Frank v. Parnell*, No. 18-CV-978, 2022 WL 2125581, at *7 (W.D. La. June 13, 2022). We agree. Frank posed no immediate threat to the safety of the officers or the public. Frank was clearly unarmed, had no ability to and never attempted to flee, and was an obese, disabled veteran.

Additionally, "this Court considers the speed with which an officer resorts to force where officers deliberately, and rapidly, eschew lesser responses when such means are plainly available and obviously recommended by the situation." *Crane v. City of Arlington*, 50 F.4th 453, 464 (5th Cir. 2022) (citing *Harmon*, 16 F.4th at 1165). It is clear from Daniel's body camera footage that the officers made no attempt to deescalate the situation, but rather deliberately and rapidly eschewed lesser responses. It

took approximately 80 seconds from when Frank handed his ID to Daniel until the officers initiated physical contact with Frank. Parnell fired a taser probe into Frank's chest only 32 seconds later. A mere 8 seconds later, Spillman put Frank in a chokehold. Within the next 45 seconds, Frank was shot or stunned with a taser six separate times and put in another chokehold. A jury could conclude that reasonable officers would have been keenly aware that this level of force should not have been used in this situation. The threat-of-harm factor favors Frank.

"While the remaining two factors do not weigh as heavily upon our analysis, they yet demand attention." *Crane*, 50 F.4th at 465.

### ii. Severity of the crime

The district court held that the *Graham* severity of the crime factor "weighs in favor of the officers as they were attempting to execute a felony arrest warrant." *Frank*, 2022 WL 2125581, at *6. It asserted that since the "officers knew there was a felony warrant outstanding and that based upon that warrant, they had probable cause to arrest Frank." *Id.*

In the recent case of *Crane v. City of Arlington*, however, the court did not find the fact that the warrant was for "an unconfirmed felony probation violation" and multiple confirmed misdemeanor warrants as wholly dispositive of this factor. 50 F.4th at 465. Parnell testified that he was advised that the open warrant for Frank "was a felony warrant[,]" but that he did not recall if he knew what the warrant was about. Neither Daniel nor Spillman knew or inquired into the nature of the felony warrant.

The warrant was for simple criminal trespass and attempted unauthorized entry of an inhabited dwelling. Simple criminal trespass is a misdemeanor, and unauthorized entry of an inhabited dwelling is a felony.

Case 1:18-cv-22990-KDD-DP
Case: 22-30408
Document 005116924850
Document 005116924850
Page 12/19
Filed 10/10/2023
Page 12/19
Filed 10/10/2023: 4138

LA. STAT. §§ 14:63, 14:62.3.[2] Daniel's incident report does not state that the warrant was for a felony or any type of violent crime, but rather says that he was aware of "the existence of a warrant . . . ." None of the officers arrived at the scene with their weapons drawn or appearing alarmed by the severity of the violation. Any felony warrant does not automatically tip the "severity of the crime at issue" prong to weigh in the officers' favor, and, in fact, prior case law implicitly recognizes that a felony warrant is not automatically dispositive of this factor. *Crane,* 50 F.4th at 465; *Aguirre v. City of San Antonio*, 995 F.3d 395, 408 n.5 (5th Cir. 2021) ("Even if [Frank] were suspected of a serious crime, this would not necessarily be dispositive.").

None of the officers felt the need to be particularly cautious of Frank or take a protective position. The conversation was relaxed and friendly at first.[3] This factor is, at best, neutral.

### iii. Actively resisting arrest or attempting to evade arrest by flight

"Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). "However, officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Id.* (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). In *Deville*, the court found that the fact that the officer "engaged in very little,

---

[2] An attempt, which is what Frank was charged with, "is a separate but lesser grade of the intended crime." LA. STAT. § 14:27. Nevertheless, it is still a felony.

[3] For example, soon after the officers arrived, Daniel motioned to Parnell and said to Frank that he "understand[s] you're a veteran. Both of us are too." The fact that Daniel knew Frank was a veteran also lends credence to the allegation that Frank was known to the police.

No. 22-30408

if any, negotiation with her—and . . . instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle" was relevant to this factor. *Id.* at 168. Here, there was no attempt at any negotiation. Frank asked what the warrant was for or to see the warrant, and the officers only replied that he would find out after he was arrested and at the station. In his deposition, Daniel agreed that Frank asking why he was being arrested "was a reasonable question," he was "not aware of any downside" to calling the station and finding out the nature of the arrest warrant, that he could have easily "found out" the reason, and that telling Frank the full information about why he was initiating contact with him was a reasonable request. This is not to say that the officers were required to show Frank the warrant in this situation. They should have, however, engaged in some other de-escalatory action before resorting to violence in this circumstance, since such means were plainly available given that Frank was sitting unarmed and not able to flee on a blocked-in tractor. *Deville*, 567 F.3d at 168.

Here, the district court held that it could not say that Frank was only passively resisting arrest. *Frank*, 2022 WL 2125581, at *7 ("Although Frank's initial demeanor was calm, he became increasingly obstinate when officers did not do as he requested to present him with a warrant."). A jury could conclude, however, that reasonable officers would have been aware that they should not have been repeatedly tasing and choking an unarmed, disabled man sitting in a blocked-in tractor. The district court held that "Frank reached for the taser. Parnell grabbed his wrist, and Frank pulled his arm away." *Id.* At *8. From the video evidence, there is, at a minimum, a factual dispute about whether Frank was reaching for Parnell's taser or was simply pulling his arm away to avoid being grabbed and tased.

In *Trammell v. Fruge*, the court held that there was "a factual dispute as to whether Trammel was actively resisting arrest throughout his encounter with the police officers." 868 F.3d at 341. There, the court held that "it

appears that Trammel's only physical resistance prior to being tackled was his attempt to pull his arm away." *Id.* Additionally, the court noted that the officer was not pulled forward. *Id.* But, the court continued,

> even if Trammel's decision to pull his arm away from the officers can be characterized as some degree of resistance that would justify an officer's use of force, the quickness with which the officers resorted to tackling Trammel to the ground militates against a finding of reasonableness. This Court has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need.

*Id.* At 342. This situation is similar to *Trammell*; "[A] reasonable jury could infer that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required 'measured and ascending' actions calibrated to [Frank's] conduct." *Id.* (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)).

"Excessive force claims are necessarily fact-intensive[.]" *Deville*, 567 F.3d at 167. The Fifth Circuit has held that excessive force existed when an officer tased someone who only pulled his arm out of the officer's grasp. *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013); *see also Trammell*, 868 F.3d at 341–42 (arrestee pulling his arm away from officer's grasp did not alone justify two officers' tackling him to the ground). Drawing all inferences in Frank's favor, Frank satisfies this factor.

No. 22-30408

Frank has shown that there is a factual dispute about whether the officers' use of force in this situation was unreasonable and violated his Fourth Amendment rights.[4] We now turn to the clearly established prong.

## 2. Clearly established right

"Officers' conduct violates a clearly established right when there is 'controlling authority . . . that defines the contours of the right in question with a high degree of particularity.'" *Aguirre*, 995 F.3d at 415 (quoting *Linicomn v. Hill*, 902 F.3d 529, 538 (5th Cir. 2018)). Clearly established law should not be defined at a high level of generality, but "it is not necessary that a previous case presenting identical facts exist in order for a right to be clearly established." *Id.* This is because the central concept is that of fair warning: "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Trammell*, 868 F.3d at 339 (internal quotations omitted).

"Lawfulness of force, however, does not depend on the precise instrument used to apply it." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012). "Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel." *Id.*

---

[4] Additionally, "[i]n evaluating excessive force claims, courts may look to the seriousness of injury to determine 'whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur.'" *Deville*, 567 F.3d at 168 (quoting *Brown v. Lippard*, 472 F.3d 384, 386–87 (5th Cir. 2006)); *see also id.* ("[T]he extent of [the] injury inflicted may be considered in determining whether the officers used excessive force.") (internal quotations omitted).

at 763–64. In *Newman*, however, the court dealt with a similar situation involving the use of a taser. Officers pulled over a vehicle for a traffic stop and noticed that a passenger, Mario Cole, had a warrant out for his arrest. *Id.* at 759. Cole got out of the car and began struggling with the police. *Id.* Against police warnings, Newman also exited the vehicle to talk with Cole. *Id.* Backup officers arrived with their tasers out, and instructed Newman to go to the rear of the vehicle. *Id.* at 760. During a search of his person, the police officer contended that Newman grabbed his hand and placed it on Newman's privates. *Id.* The officer pushed Newman towards the car, and another officer came to the scene, struck Newman with his baton, and then tased him three times. *Id.*

The officers argued that "Newman resisted search and arrest, that he struggled and was noncompliant, that he reached for his waistband, potentially for a weapon, and that their actions were necessary to prevent serious injury or death to themselves." *Id.* at 762. The court held that no reasonable police officer would have found Newman to be armed or trying to flee. *Id.* Therefore, the court held that the police used unconstitutional excessive force that violated a clearly established right. *Id.* At 764. Heeding the court's analysis in *Deville,* that the degree of force is not justified where the officer "engaged in very little, if any, negotiation" with the suspect, the *Newman* court held that it was relevant that the officers "immediately resorted to taser and nightstick without attempting to use physical skill, negotiation, or even commands." *Id.* at 763. Here, the officers used commands, but failed to attempt any other action to effectuate compliance short of tasing, twisting, and choking Frank. *Deville*, 567 F.3d at 167 (when considering a suspect's refusal to comply with instructions, "officers must assess not only the need for force, but also the relationship between the need and the amount of force used.") (internal quotations omitted).

No. 22-30408

Furthermore, the Supreme Court held that "in an obvious case," the *Graham* excessive-force factors themselves can "clearly establish" the answer, even without a body of relevant case law. *Newman*, 703 F.3d at 763 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). None of the *Graham* factors justify the officers' actions against Frank. Even without *Newman* or *Deville*, a jury could conclude that the officers used excessive force and that they had reasonable warning their conduct violated Frank's clearly established Fourth Amendment rights.

Therefore, the Appellees were not entitled to qualified immunity, and the district court erred in granting their motion for summary judgment.

## II. State law claims

"Louisiana's excessive force tort mirrors its federal constitutional counterpart." *Deville*, 567 F.3d at 172. "Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case," and it includes "the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment." *Kyle v. City of New Orleans*, 353 So. 2d 969, 973 (La. 1977). "These considerations are sufficiently similar to the *Graham* factors that our decision on this claim mirrors our decision of plaintiffs' § 1983 excessive force claim . . . ." *Deville*, 567 F.3d at 173.

The federal qualified immunity analysis applies here. There is a genuine issue as to whether any of the officers used unreasonable or excessive force, so the district court is reversed as to the dismissal of the appealed Louisiana state law claims.

## III. Punitive damages

"[P]unitive damages may be awarded only when the defendant's conduct is motivated by evil intent or demonstrates reckless or callous indifference to a person's constitutional rights." *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1015 (5th Cir. 2003) (internal quotations omitted). "The latter standard requires recklessness in its subjective form, *i.e.* a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Id.* (internal quotations omitted). Frank argues that the district court abused its discretion by dismissing his punitive damages claim, and he contends that there is a triable issue of fact about whether the officers demonstrated reckless or callous indifference to his constitutional rights.

In light of the evidence before it, a jury could reasonably infer that the officers' acts were unjustified and that they acted with callous or reckless indifference to Frank's constitutional rights. *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 513–14 (5th Cir. 2022) ("Plaintiffs have therefore met their burden to raise a fact dispute over whether each of these Individual Defendants demonstrated reckless or callous indifference to [Plaintiffs'] constitutional rights. . . . In sum, Plaintiffs' claims for punitive damages should have survived summary judgment.").

## IV. Medical causation

The district court denied as moot Appellees' motion for summary judgment as to medical causation. This issue is left to the district court after remand.

## V. State law respondent superior

Frank waived his federal *respondeat superior* claims against the City of Marksville and Doug Anderson as Avoyelles Parish Sheriff. He does, however, contend that the City and Anderson are still liable under the state

tort claims. Unlike federal law, "[m]unicipalities do not enjoy special protection from vicarious liability under Louisiana law and are subject to *respondeat superior* like every other employer." *Deville*, 567 F.3d at 174; *see also* LA. CIV. CODE art. 2320 ("Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."). "Although an employment relationship may in fact exist, the employer will not be liable for the substandard conduct of the employee unless the latter can be fairly said to be within the course and scope of the employment with the former." *Brasseaux v. Town of Mamou*, 752 So. 2d 815, 820 (La. 2000). As the court held in *Deville*,

> The district court did not reach the question of whether the [municipality] is vicariously liable, concluding that it was entitled to summary judgment because plaintiffs failed to sustain their state-law claims against the individual defendants. Because this conclusion was in error, we reverse. On remand, should the district court reach the issue of the [municipality's] vicarious liability, it should then consider in the first instance whether [individual defendants] were acting within the scope of their employment such that the [municipality] can be held liable for plaintiffs' viable state-law claims against the individual defendants.

567 F.3d at 174.

Since the district court is reversed as to the state court claims, we leave this matter to the district court to decide in accordance with the instructions given in *Deville*, keeping in mind that "the employer of a police officer is liable for wrongful injury inflicted while performing his official duties." *Bourque v. Lohr*, 248 So. 2d 901, 904 (La. Ct. App. 1971); *see also*

*Buchicchio v. LeBlanc*, No. CV 22-00147-BAJ-EWD, 2023 WL 2027809, at *10 (M.D. La. Feb. 15, 2023) ("Under Louisiana law, Sheriff Cazes—as Chief Juge's employer—may be liable for Chief Juge's tortious on-the-job conduct.").

## Conclusion

The judgment of the district court is VACATED as to granting summary judgment to Appellees on qualified immunity grounds, the dismissal of the parallel Louisiana state tort claims, and the denial of punitive damages as a matter of law. On REMAND, the district court can consider any challenges to medical causation as well as vicarious liability against the City of Marksville and Doug Anderson in accordance with this court's decision.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

October 10, 2023

Mr. Tony R. Moore
Western District of Louisiana, Alexandria
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

     No. 22-30408   Frank v. Parnell
                 USDC No. 1:18-CV-978

Dear Mr. Moore,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    By: _____
                    Whitney M. Jett, Deputy Clerk
                    504-310-7772

cc:
     Mr. Stacy Christopher Auzenne
     Mr. Justin Bonus
     Mr. Harry Bradford Calvit
     Mr. Jonathan Edelstein